IN THE UNITED STATES DSITRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| George Boatman | ) | |
| | ) | Case Number: |
| v. | ) | Judge: |
| | ) | |
| Mavron Transport Illinois, Inc. | ) | |

## COMPLAINT

Plaintiff George Boatman, (hereinafter "Plaintiff" or "Boatman"), by and through his attorneys Langone, Johnson, and Cassidy LLC, files this Complaint against Defendant, Mavron Transport Illinois, Inc. (hereinafter "Defendant"). Plaintiff seeks damages from Defendant and states as follows:

### NATURE OF THE CLAIMS

1. This is an action for monetary damages, under Title VII of the Civil Rights Act of 1964, as amended, 42 USC § 2000e-2(a) (hereinafter "Title VII").

2. This action is to redress Defendant's unlawful employment practices against Plaintiff.

3. Specifically, Defendant's unlawful discrimination against Plaintiff because of his race, leading to a hostile work environment and his eventual constructive discharge.

### JURISDICTION AND VENUE

4. This Court has jurisdiction of the claims herein pursuant to 28 U.S.C. § 1331 and 1343, as this action involves a federal question regarding Plaintiff's civil rights under Title VII.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## THE PARTIES

6. Plaintiff, George Boatman, ("Boatman"), is a citizen of the United States and a resident of the State of Illinois.

7. Defendant, Mavron Transport is a foreign corporation (Canadian) that operated within the United States, with a corporate office in Michigan and which operating in Illinois, as alleged herein.

8. Defendant is an "employer" as defined by Title VII.

9. Defendant employs over 500 employees.

## PROCEDURAL REQUIREMENTS

10. Plaintiff has complied with all the statutory prerequisites to filing this action.

11. On February 12th, 2018, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, ("EEOC"), alleging that the Defendant violated Title VII of the Civil Rights Act of 1964.

12. Plaintiff's EEOC charge was filed within three hundred (300) days after the alleged wrongful conduct.

13. On or about December 11th, 2018 the EEOC issued to Plaintiff a Notice of Right to Sue, which was dated December 11th, 2018 and presumably placed in the mail that day.

14. This complaint was filed within ninety (90) days of Plaintiff's receipt of the EEOC's Right to Sue letter.

## FACTS

15. Plaintiff re-alleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs 1-14, above.

16. Plaintiff was hired by Defendant in the month of November 2017 as a truck driver.

17. Plaintiff's truck was parked in a communal truck lot in Lemont, IL. Defendant did not own this lot, but rented truck parking spots there, and kept trucks they owned there.

18. There were three sets of keys made for the truck Plaintiff drove. One was given to Plaintiff, one was given to the other driver of the truck, Raymond, and one was kept at the corporate office in Taylor, MI.

19. On November 12th, 2017, Plaintiff's first day on the job, Plaintiff discovered a note with the word "nigger" written on it placed on the dashboard of his truck.

20. Only two people had access to the inside of the truck at the time of this incident: Plaintiff and coworker Raymond.

21. Plaintiff was the only black Mavron employee at this location.

22. Upon telling manager John Kramer ("Kramer") over the phone, Plaintiff was told "don't let them run you off like the last guy".

23. No disciplinary measures were taken by management after this altercation.

24. Plaintiff and Raymond shared a truck while at work, and continued to share this truck during the duration of Plaintiff's employment with Defendant.

25. Kramer finally told Plaintiff through text that he could drive a truck separate from Raymond on December 22nd, 2017 when Plaintiff informed Kramer that he planned on quitting.

26. This was done to keep Plaintiff from quitting, and not because Kramer intended to address the race problems at his location.

27. During the duration of his time working for Defendant, Plaintiff was subjugated to discriminatory and at times dangerous actions as a result of his skin color.

28. Raymond would finish his shift and leave with the truck, making it impossible for Plaintiff to do his job.

29. Plaintiff would leave personal belongings, bought for the purpose of truck driving, in the truck and discover them missing.

30. Plaintiff once discovered that the break lines of his truck were tied and that his airlines were "popped off", this could have been a potentially life-threatening situation for Plaintiff.

31. After this incident, Plaintiff filed a police report.

32. In total, Plaintiff filed two police reports during his time working for Defendant, alleging harassment and discrimination, without any action being taken by management.

33. Plaintiff does not have a history of filing police reports outside of those he filed with Defendant.

34. Because of these reports, other members of the company began to retaliate against Plaintiff for addressing the discrimination, he experienced.

35. Raymond's friend Dave, whose job it was to load and fix trucks frequently used the word "nigger" with and around Plaintiff.

36. Nicole, who worked in the dispatch office, told Plaintiff that one of the managers Jessica would casually accept Raymond's racism while talking to him over the phone.

37. Plaintiff told Kramer of Dave's attitude and the culture of racism at this location, via text message on December 8th, 2017, and was told to forget about it, or words to that effect.

38. On December 19th, 2017, Plaintiff informed Kramer, via text message, that belongings he had left in his truck were missing. At this time Plaintiff and Raymond continued to be the only people who had access to the truck.

39. Kramer continued to be informed of these issues, via text message, on December 20th, December 21st, and December 26th, 2017. Kramer at times said he would handle the situation, and at times didn't respond.

40. Around mid-December, Defendant's "driver settlements" which showed the routes, mileage, and total pay Plaintiff was entitled to begin to become inconsistent with Plaintiff's daily driver log, which chronicled the trips he took and should have been identical to Defendant's driver settlements.

41. At times, Defendant's driver settlements for Plaintiff would omit entire trips or falsify the location to which Plaintiff was driving.

42. Plaintiff's daily log shows a trip on December 16th, 2017, that contradicts what Defendant documented on its "driver settlement."

43. It would have been impossible for Plaintiff to acquire a receipt from a hotel located in Taylor, MI on December 16th, 2017, had he taken a trip to Bedford Park, IL, that same day, as the driver settlement alleges.

44. Plaintiff's daily log shows a trip on December 17th, 2017, which does not appear on the driver settlement.

45. Plaintiff had conducted a trip on December 17th, 2017, as he had to return the truck to Defendant.

46. Plaintiff's daily log shows a trip on December 18th, 2017, which is different from what Defendant recorded in Plaintiff's driver settlement.

47. Plaintiff's driver settlement chronicles a trip on December 19th, 2017, twice.

48. On December 22nd, 2017, Mike, the son of the owner of Mavron, who was a "higher up" in the company, admitted, via text, that he knew of the culture of racism to which Plaintiff was subjected.

49. On December 23rd, 2017, Plaintiff again mentioned to Mike through text that he was being subjugated to a culture of racism, again showing that Mike was aware of it.

48 On December 24th, 2017, Plaintiff contacted "Sachin" from the corporate office in MI, via text message, that Raymond's racist attitude persisted and that he needed something to be done about it.

49. On December 24th, 2017, Mike admitted, via text, that he was aware that Plaintiff was not being paid properly.

50. On December 26th and 27th Plaintiff was required to drive 19 hours straight, through a snowstorm, in violation of safety standards for the trucking industry.

51. On December 26th, 2017, Plaintiff contacted Sachin via text message to inform him that he had been driving for fifteen hours straight and needed to stop.

52. In the same text conversation Plaintiff asked Sachin to call him instead of text four times as it was a safety concern for Plaintiff to have to keep looking at his phone.

53. Plaintiff had a phone conversation with Kramer during this trip, who ordered him to continue driving.

54. On December 27th, 2017, Plaintiff again told Kramer through text that he needed to stop. Kramer responded through text stating "you like six hours of sleep", alluding that Kramer did not want Plaintiff to stop driving even though Plaintiff made clear that driving was getting dangerous due to lack of sleep.

55. Plaintiff's daily log chronicles this trip, as do texts and calls made to Kramer and Sachin, and a video Plaintiff recorded showing the driving conditions on this date.

56. This trip, however, did not appear on Plaintiff's driver settlements form, which should highlight all trips made, mileage, and pay.

57. Defendant quit on December 27th, 2017, having still not been paid what he was owed.

58. Plaintiff advised Mike via text message on January 8th, 2018, that he had still not been paid. Mike said he would address this issue.

59. Plaintiff told Mike, via text message on January 25th, 2018, that he had still not been paid. Mike again said he would address this issue.

60. Plaintiff asked Mike. via text message on January 26th, 2018, if anything had been done about his pay. Mike did not respond.

61. On January 31st, 2018, Plaintiff received a check that was short of amount owed.

62. That same day, Kramer told Plaintiff, via text message, to disregard the racism he experienced while working for Defendant. Kramer states, via text message, that Defendant has top lawyers and if Plaintiff pursues legal action he will get none of the money he is owed.

63. On February 1st, 2018, the check Plaintiff received bounced and Plaintiff was fined $36 by his bank.

64. Plaintiff advised Mike via text message on February 1st, 2018, that he had still not been paid and that he had been fined. Mike said he would address the issue.

65. Plaintiff's 2017 W2 Form representing his wage summary during his time with Defendant does not accurately state the amount that Plaintiff was paid while working for Defendant.

66. Plaintiff's 2017 W2 Form states that he made $3549.75 while working for Defendant.

67. Plaintiff's checks received from Defendant, not including checks owed, total $6,919.77

68. Plaintiff has still not been paid in full for his time working for Defendant.

69. Plaintiff's terms and conditions of employment were so unreasonable that making the work environment so intolerable a reasonable person would not be able to stay.

**COUNT I: Violation of Title VII of the Civil Rights Act of 1964 (42 USC §20003 et seq.)**

**Unequal Terms and Conditions of Employment, Due to Race & Color**

70. Plaintiff re-alleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs 1-68, above.

71. Plaintiff is part of a protected class under Title VII (Race).

72. Plaintiff was a good employee, fulfilling the various duties he had as a truck driver.

73. Plaintiff was always on time.

74. Plaintiff had no disciplinary reports written about him during his time working for Defendant.

75. Plaintiff had no disciplinary measures taken against him during his time working for Defendant.

76. Plaintiff put himself in danger by driving longer than is typically allowed in the trucking industry on December 26th, 2017, for Defendant.

77. Plaintiff put himself in danger by driving through a snowstorm on December 26th, 2017, for Defendant.

78. Plaintiff was the only black employee at his location.

79. Other employees who were similarly situated, who were not part of a protected class, were treated differently than Plaintiff.

80. Other employees who were similarly situated were not discriminated against verbally as Plaintiff was.

81. Other employees who were similarly situated did not have their driver settlements represent fraudulent information, as Plaintiff's did.

82. Other employees who were similarly situated were paid properly, unlike Plaintiff.

83. Plaintiff was told "don't let them run you off like the last guy" by Kramer, highlighting racism as a continuing issue at this location.

84. On the first day of work, he found a note with "Nigger" written on it on his windshield.

85. Other employees referred to Defendant in the same manner.

86. Management was made aware of these interactions on multiple occasions during and after Plaintiff's time with Defendant.

87. Defendant had a duty to address racism in the work place.

88. Defendant did nothing to address the problem of racism in the work place.

89. Two police reports were made alleging discrimination, yet Defendant still refused to do anything.

90. Following the police reports, Plaintiff's driver settlements began to have false information and missing information.

91. Management told Plaintiff multiple times to forget the race issues, during and after Plaintiff's time working for Defendant.

92. Even after quitting, Plaintiff still did not receive the money he was owed.

93. Mike told Plaintiff that he would address the pay issues on January 8th, January 25th, and February 1st.

94. Defendant lied on W2 Form in terms of what Plaintiff made while working for Mavron.

95. Plaintiff is still owed money to this day.

96. Plaintiff's W2 Form is still incorrect to this day.

97. Plaintiff was discriminated against during the entirety of his employment with Defendant due to his race.

98. Defendant failed to meet their duty to Plaintiff in terms of workplace safety, addressing workplace discrimination, keeping track of Plaintiff's location on driver settlements, paying what was owed, addressing pay issues, and providing a proper W2 Form.

## RELIEF SOUGHT

WHEREFORE, Plaintiff respectfully prays for the following relief:

    A.    Damages in accordance with Title VII requirements;

    B.    Pay still owed to Plaintiff;

    C.    Costs of suit;

    D.    Any other relief the Court deems just and appropriate.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

                                                                                         Respectfully Submitted,
                                                                                        /s/ <u>Daniel P. Johnson</u>

Langone, Johnson & Cassidy, LLC
17 N. Wabash, Ste. 500
Chicago, IL 60601
(312) 761-3330
dan@ljclegal.com